UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,           )
                                    )
      Plaintiff,                    ) No. 15-CR-1928-LAB
                                    )
        v.                          ) May 2, 2016
                                    )
JOSEPH BUDDENBERG,                  ) 10:08 a.m.
                                    )
      Defendant.                    ) San Diego, California
_____    )


                    TRANSCRIPT OF SENTENCING
           BEFORE THE HONORABLE LARRY ALAN BURNS
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:         UNITED STATES ATTORNEYS OFFICE
                           By:  JOHN N. PARMLEY, ESQ.
                                MICHAEL F. KAPLAN, ESQ.
                           880 Front Street
                           San Diego, California  92101

For the Defendant:         WARREN & BURSTEIN
                           By:  DEVIN JAI BURSTEIN, ESQ.
                           501 W Broadway
                           San Dieog, California  92101

Court Reporter:            CYNTHIA R. OTT, RDR, CRR
                           District Court Clerk's Office
                           333 West Broadway, Suite 420
                           San Diego, California, 92101
                           cynthia_ott@casd.uscourts.gov

Reported by Stenotype, Transcribed by Computer

SAN DIEGO, CALIFORNIA, MAY 2, 2016, 10:08 A.M.

* * * *

THE COURTROOM DEPUTY:  Calling matter 2 on calendar, 15-CR-1928, U.S. versus Joseph Buddenberg set for sentencing with presentence report.

MR. BURSTEIN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BURSTEIN:  Devin Burstein for Mr. Buddenberg who is present on release.

MR. PARMLEY:  John Parmley and Michael Kaplan for the United States.  Good morning.

THE COURT:  All right.  Good morning.  All right. This matter is on for sentencing today, if the Court accepts the defendant's plea.  This was tendered as an 11(c)(1)(c) plea and the effect of that is it's binding on the Court.  If I accept the plea, then I have to go along with the parties' recommended sentence.  I have the option to reject the plea, and if I do, it puts the defendant back at -- in the original position he was in.

I have read and considered the presentence report, looked at sentencing summary charts filed by both sides.  The government filed a sentencing memorandum as to the defendant, I have read both of those.  There are objections to the presentence report and those have been responded to.

Mr. Parmley, there was a letter included in the

government's sentencing papers --

MR. PARMLEY:  Yes.

THE COURT:  -- from one of the victims in this case, and it was indicated in your papers that that that person, Kimberly Graf, was intending to be here to address the Court. Is she here today?

MR. PARMLEY:  She is present in court, yes.  I'm not sure if she has decided whether or not she'd like to speak, but she is present in court.

THE COURT:  All right.  I'm assuming that as part of the discretion I exercise on whether to accept the plea or not, that I can hear from her before I make that decision.

MR. PARMLEY:  Absolutely.

THE COURT:  Do you agree with that?

MR. BURSTEIN:  I don't know the answer to the questions to be perfectly honest, Your Honor.  I don't see why you couldn't.

THE COURT:  Pardon me?

MR. BURSTEIN:  I don't see why you couldn't, but I haven't researched it as a legal matter.

THE COURT:  Yeah, I don't either.  I mean, it seems to me that, you know, I'm entitled to read all of the sentencing memoranda as well as the probation report.  Her letter is in there.  Will you inquire of Ms. Graf?

MR. PARMLEY:  I will, Your Honor.  And I do think the

Court should have all of the information available before it makes a decision.

THE COURT:  Yeah, I mean one of the things she says is of concern to me.  She says in the second to last paragraph, "Everyone who hears his suggested prison time in this plea agreement is shocked that it's so lenient and insignificant compared to the huge amount of monetary and emotional damage suffered by all of the victims of their attacks."  I note that there's 14 separate incidents in which the defendant, you know, vandalized property, some more serious than others.

Now, on the other hand, I have to tell Ms. Graf this, she's not a lawyer.  The Court is buffeted here because it's the prosecutor who gets to make the charging decision, ultimately decides, you know, what the defendant has to plead guilty to and my hands are tied on that.  Now I don't have to accept this if I think it's outrageously low, shocking as you say, then I can reject it and say it's just not in the interest of the community.

But there are a lot of factors that go into that analysis.  First, I have to be deferential to the prosecutor. It's not my job to charge and decide what the appropriate disposition of a criminal case is.  Second, to some extent I understand that this is inclined to save the government some resources.  It appears that the conduct occurred in many different states and the trial of this case would probably be

complicated with people coming in and cost a lot of money to bring those people in.

I'm to look and determine whether, you know, the leniency is caused because the government has some problem of proof. It doesn't appear to me that you do. I mean I read the proof on this and the search of the car with all of the stuff found in there and the tracking devices. It looks like the defendant is good for all of these things.

He denies that he stole thousands of items and sold them over eBay, but it appears to me that he acknowledges implicitly that he financed these vandalism trips by stealing things and selling them on eBay, I don't know how many. So it looks like a pretty aggravated case to me from that respect or in that respect.

Anyway, I'm buffeted here. I don't get to make the decision as to what's, you know, the appropriate disposition. That's ultimately up to the defendant and the government. I try to keep my thumb on the pulse of what a community thinks and I tend to agree with you, I was kind of shocked when I looked at this and saw not just that 24-month sentence but a sentencing range that's 24 to 30. And the government goes even to the low end of the range on this, which, you know, I don't see the reason for it. It doesn't seem proportionate.

But I'd like to hear from Ms. Graf. I mean, she is a member of the community. I'm detached a little bit. I stay in

touch with people as I say, but as I said she says that she was shocked and that everyone that she's talked to about the disposition of this case is shocked at the leniency.  So I want to hear from her.

MR. PARMLEY:  I've spoken to her and she would like to speak, Your Honor.

THE COURT:  Ms. Graf, you want to come forward.  If you'd stand aside, sit at counsel table.  Let me hear from Ms. Graf first, please.

Good morning, Ms. Graf.

MS. GRAF:  Good morning, Your Honor.

THE COURT:  So I just want you to understand the nature of what's going on here.  If I accept this plea, in essence, I'm handcuffed.  They've made a deal where I can't exercise any sentencing discretion at all.  You watched the last case where this factor, that factor played into my determination.  Essentially here, you know, I'm a functionary. I have to rubber stamp a deal that they made.

Now, I don't like doing that, particularly if I think that it's, you know, not an appropriate deal, it's too lenient as you say.  But on the other hand, there's these other factors, I'm to be deferential to them.  I'm not in the executive branch.  It's the U.S. Attorneys office that makes the decision to charge in the first instance, the disposition of the charge.

I have to tell you in the past when I've not agreed with things and I've tried to say I'm not going along with this, they've run to the appellate court and the appellate court says you've got to defer to them.  So I mean what I can tell you is I'm with you in spirit on this.  I think this is outrageously low given everything that I've read in the probation report, but I'm happy to hear from you.

MS. GRAF:  Well, we have this binder here that is indicating 30 years of the attacks that we've suffered from people like the defendant.  And so it's very emotional and very personal for us.  We appreciate all that law enforcement, the courts, everybody that has pursued this, and I was just reiterating what everybody that has spoken to me that's heard the sentence was just dumbfounded.

And my response to them was, well, we're happy that they were able to prosecute someone finally.

THE COURT:  Did the other instances go unprosecuted?  They never found anybody or couldn't charge anybody?

MS. GRAF:  Only one other case.

THE COURT:  What happened in that case?

MS. GRAF:  The person was sentenced -- or didn't have any sentencing, it was just restitution.  He pled guilty.

THE COURT:  How much damage was done compared to this time?

MS. GRAF:  Like minus one.  It was a broken sign.

THE COURT:  Okay.

MS. GRAF:  But we had him on videotape and he confessed to it.  And he got like almost $2000 in restitution charged because of my time and everything that was going on and the sign.  We had to get a new video system because the FBI needed the flash drive and all that, so there was a lot of expenses other than just the actual sign.

But that was -- and that was just last year.  So for 30 plus years we've been suffering this.  But this attack was so personal because they came to my home, my parents' home and also our business.  And the health effects, we don't have any idea what the health effects are going to be because of the things that they sprayed around our homes and our business that we've been exposed to.

They totalled a vehicle.  You know, I mean you have all the information.

THE COURT:  Yeah.

MS. GRAF:  But it's just, it's so personal and so heinous, we just, you know, but we agree that finally somebody's been prosecuted.

THE COURT:  So were you consulted on the plea agreement?  Did you have input before they reached it or were you just told this is the deal?

MS. GRAF:  We were told that was the deal.  Nobody from probation has contacted us.  But Mr. Parmley's office has

been very active in keeping us informed of the different sentencing hearings and everything, but we've had no input basically except for like letters like that I sent to you.

THE COURT:  Right.

MS. GRAF:  And that.

THE COURT:  Okay.  Anything else you want me to know?

MS. GRAF:  No, we just really appreciate that finally somebody's been prosecuted, and it really has damaged our business.  We live in fear and we hope that maybe with some prison time they'll at least know how it feels to have to be looking over your back for people coming after you because they've been coming after us for a long time.

THE COURT:  All right.  I'm sorry for what you've gone through and what you continue to experience.  And, you know, for what it's worth, I think, if I were your neighbor or within your circle and you were talking about this, I would be in agreement with you that it is shocking and it is lenient.  I wouldn't have made such a deal myself if I were in the executive branch, but I hope you understand my position is different, it's detached, and like I said, I've had my knuckles rapped before for putting my thumb on the scale on these deals.

I pretty much have to say this is so outrageous that I can't abide it or I've got to kind of hold my nose and say, okay, I'll accept this plea, which means I have to go along with the deal that they carved.

MS. GRAF:  Right.  We understand that.  And our family our friends, our neighbors have been very, very supportive, our customers, even when, you know, they're afraid that their garments that are in our custody are going to be damaged, they still stand up for us, and so we really appreciate that as well.

THE COURT:  All right.  Thank you for coming and thank you for your letter, Ms. Graf.

MS. GRAF:  Thank you.

THE COURT:  Anything else on the issue of whether the Court should accept or reject the 11(c)(1)(c) plea?

MR. BURSTEIN:  No, Your Honor.

MR. PARMLEY:  I don't believe so, no.

THE COURT:  It's not an easy decision, as I said.  I reminded myself all weekend that I'm not a member of the executive, that, as I've mentioned, it's the function of the executive, the prosecutor, to represent the interest of the people that, like Ms. Graf who are victims in cases like this and that, ordinarily, I should defer to their judgment on what's appropriate.

I'm also mindful that a disposition is a certainty as opposed to running the risk of an acquittal at trial or maybe a hung jury, maybe, although it's hard for me to fathom in this district that there are time and effort demands as to other investigations.  This seems like a pretty important case to me

in the scheme of things.

I'm also aware that we're running a 99.1 percent disposition rate in this district.  99.1 percent of the cases end up in plea bargains.  That doesn't mean that .09 percent go to trial because there's dismissals and deferred prosecutions, the truth of the matter is we try very few cases, so any concern about wasting judicial resources seems to me not supportable.  And I can speak to that because after all I'm at the cusp of the judicial resources.

There's a question here about whether avoiding, you know, trial might avoid trauma to the victim.  Ms. Graf seems like she's pretty tough to me about this, disgusted with what's happened over 30 years but pretty tough and willing to see it through if that were the decision of the prosecutors.  And then I also acknowledge that here the prosecutors just may have a very different view on what the appropriate disposition is.

As I said, as I look at this objectively, there's 14 documented instances of the defendant vandalizing, some of them are just really small vandalisms, gluing locks shut on places. Others are much more extensive as what happened to Ms. Graf, destruction of property, but separate instances, different times, different places.

I mean, one would think that that would influence the government not to be so lenient, but I guess, you know, different people see things differently.  The total damage here

is $400,000 that this activity caused.  Ms. Graf and her family themselves suffered $30,000 worth of damage, and I don't know it's a -- restitution is recommended, but the defendant doesn't have a track record of high earnings, so whether that ever gets paid, who knows.

In the end, you know, I guess the most I can say is I'll grumblingly accept this.  I don't like it, Ms. Graf, I really don't.  Like I said, my sentiments are similar to those that have been expressed to you by the many people you've talked to that this is way too lenient, but balancing everything that I have to, I reluctantly accept the 11(c)(1)(c) plea.

MR. BURSTEIN:  Thank you, Your Honor.

THE COURT:  I'm happy to hear from you and Mr. Buddenberg.

MR. BURSTEIN:  We would submit, Your Honor.

THE COURT:  Does he want to make any statement?

MR. BURSTEIN:  No, Your Honor.

THE COURT:  On behalf of the United States?

MR. PARMLEY:  I appreciate the Court accepting the plea.  I understand the Court's comments, and I don't mean to sound as a rebuttal because the Court has already accepted the plea and the decision's been made, but I just want to make a couple of comments.  We are very appreciative of the Graf family, that was something that they had to go through which

was one of the reasons we got involved was because it was personal.  They went to somebody's home and then the parents home.

On the other hand, I think this was a very strong case for the idea that there was a conspiracy to violate the Animal Enterprise Terrorism Act.  There was no specific evidence linking them to any specific acts, so it was very helpful to the United States that they admitted to all these acts that would have been very difficult to prove individually as a whole.

THE COURT:  Wait a minute.  What about the stuff found in the car?

MR. PARMLEY:  Absolutely, it's very helpful, Your Honor.

THE COURT:  You say no specific evidence, I mean the stuff found in the car was like a road map of all of these incidents where vandalism took place.

MR. PARMLEY:  Absolutely true.

THE COURT:  You had GPS.  You had maps to the various people's home.  To me that sounds like a pretty specific link. It may not be direct evidence of somebody saying I saw Mr. Buddenberg there putting the hose in the window, but, you know --

MR. PARMLEY:  I don't want to argue with, Your Honor.

THE COURT:  -- circumstantial evidence, Mr. Parmley,

also works.  People get convicted based on circumstantial evidence and here it seems very, very strong.

MR. PARMLEY:  I don't want to argue with you because I feel like I'm going to lose, but I do want to make this point that I agree, there is great evidence, the GPS was limited to San Diego.  There was no GPS of any of the other --

THE COURT:  What do you mean then when you say there's no specific evidence?  I mean, it seems to me it's very specific.  It has addresses of places that you know were the subject of animal rights protest, vandalism and destruction of property.  And it's not coincidental that all of those are on like a flowchart that you find --

MR. PARMLEY:  Absolutely true as it relates to what happened in San Diego.  I'm talking about the $300,000 plus in damages in Idaho and Wisconsin and places where we didn't have specific evidence, but there was great circumstantial evidence, I would agree with you.  But I appreciate the Court accepting the plea.  Obviously, the Court disagrees with it.

I would make one other point, probation has recommended restitution in the amount of $398,272.  That is accurate, but they left out -- accidentally they left out one of the victims on their chart, Bonlander Farms, of $141,600. It adds up to the same thing, but it was just an omission on their chart.  And they should be listed on the order of restitution.

THE COURT:  Mr. Burstein, is the restitution amount contested or agreed to?

MR. BURSTEIN:  It's agreed to in the plea agreement.

THE COURT:  Let me ask you another question, you've raised an objection which I didn't resolve, I mean, there's this reference to thousands -- that Mr. Buddenberg sold thousands of stolen items on eBay.  I implicitly, as I said I think you acknowledged that he was stealing things and selling them on eBay, the objections seem to me to be the reference to thousands of items.  If I'm going to follow the agreement, then, you know, that reference doesn't mean anything.

MR. BURSTEIN:  It's moot, I agree.

THE COURT:  Okay.

MR. BURSTEIN:  Our objections were just -- the focus of our objections were to the supervised release conditions.  I agree with Your Honor, I think that's what you're suggesting, that it's moot.

THE COURT:  Yeah, let me look at the other one too.

MR. BURSTEIN:  The first one was about location monitoring after the fact.

THE COURT:  Yeah.

MR. BURSTEIN:  But Mr. Buddenberg -- Your Honor has already let him off location monitoring.

THE COURT:  Yeah, I don't think he needs to be on that.

MR. BURSTEIN:  And the same with condition eight was internet computer prohibitions and he hasn't been on any and there have been no violations.

THE COURT:  Yeah, I'm less inclined to do that one. Wasn't there a house arrest condition too that you objected to?

MR. BURSTEIN:  That's the one -- that's condition seven, GPS with home detention.

THE COURT:  Yeah, I'll sustain your objection to that. You're right that, you know, once he got out on bail he behaved himself, and I assume that this is a shot across his bow and he'll behave himself.  I'm less convinced on the other one.  I mean, the government says, look, they were sneaky and they took precautions to make sure that, you know, that there was no electronic footprint of what they were doing, where they were.

MR. BURSTEIN:  It's true, Your Honor, but let me just say this is, as the Court knows, Mr. Buddenberg's primary line of business.  He's been doing this the whole time.  He --

THE COURT:  I'm not saying no access to computer, but why can't he have a monitoring device so we see what he's doing?

MR. BURSTEIN:  Well, he hasn't had one.  He's going to be on supervised release.  There are issues with his clients. If I'm a client buying a book, I personally don't want --

THE COURT:  How would you know?  He's selling stuff on eBay.  I've bought stuff on eBay.  I don't call and say, wait a

minute now, I want a dossier on you before I decide to buy this from you.  It's all price driven.  That seems really hypothetical.

MR. BURSTEIN:  Your Honor, I think it's rare that somebody who's been out the entire time on pretrial with no violations, it's rare that after the fact when he's going to go to prison, when he needs to then get his life back in order that we're going to have more restrictive conditions.

THE COURT:  We're talking about a pretty modest thing here.  The right of the probation officer to occasionally look at, monitor, I mean, in this case computers were used.  Things were posted online that took credit for these various acts of vandalism and, you know, I think they have a right.  I don't think he should be involved with this kind of activity.

I'm not talking about animal rights advocacy.  I'm not restricting that.  But I certainly don't think he should be perusing more radical websites where they're recommending violence or championing violence or applauding it after it occurs.  And I wouldn't want him to get drawn back into that. I mean, he's the one that tells me this thing got out of control, went over the top, you know, based on passionate feelings he has about protecting animals.  So what's the problem with having probation have a check on that?

MR. BURSTEIN:  Let me try one other argument, maybe Your Honor can issue an order that would take it away, but a

different argument is that typically the person has to pay for that monitoring.  Every dollar that he's going to be spending paying for location monitoring --

THE COURT:  I'm not going to do that.

MR. BURSTEIN:  Sorry, computer monitoring, the software, every dollar he has to spend on that --

THE COURT:  How much is that?

MR. BURSTEIN:  I don't know.

THE COURT:  What's the cost to monitor a computer, do you know?

MS. CHALMERS:  Your Honor, Victoria Chalmers from probation.  I do not have an answer to that question nor does my coworker here.  I can find out though and get you an answer as quickly as possible.

MR. BURSTEIN:  Your Honor --

THE COURT:  I agree with you that it makes more sense to have that go to restitution than it does to that.  Here's what I'm going to do, I'll order it with the proviso that I'll strike it if the cost is prohibitive.  I mean if it's more than some nominal cost per month, but I think it's an appropriate condition given that, as I said, computers were used, the internet was used to report that these things had happened.  I think probably to drum up support.

I think that's the reason you announce it, sort of like ISIS announcing its latest action or assistance, they use

it as a recruiting tool.  And I don't think he should be involved in that.  As I said, I'm drawing a line here.  I'm not trying to talk him out of his views about advocacy on behalf of animals.  There's a legitimate way to protest his view that animals are being mistreated.

The illegitimate way is to get on sites that advocate violence or the kind of vandalism that he engaged in, and I don't want him to do that.

MR. BURSTEIN:  Your Honor, we'll bring it back to the Court if it becomes a dollar issue.

THE COURT:  I'll find out within the next 10 days, which I have time to modify the judgment then.  If it turns out that it's a high number, I'll strike it, because I do agree with your second argument that it's better that that money go toward restitution.

Anything else from either side?

MR. BURSTEIN:  Just one quick, the last, our last --

THE COURT:  Yeah, I'm not inclined to go along with that.  Here's why, I don't know what information you've got, every time I call on that, it's been a rumor for years that a self-surrender makes a difference.  Every time I call, they say absolutely not, it's not true.

MR. BURSTEIN:  I've looked at their papers, Your Honor.  They publish them.  It's in their worksheet.

THE COURT:  Isn't it silly though that I would say,

okay, come back tomorrow and that's going to make a difference as to where he gets sent?  He's in category I.  The sentence is relatively modest.  He's got no history of violence.  I can't imagine them sending him to Leavenworth or to a maximum security prison, notwithstanding the charge he's pled guilty to.

MR. BURSTEIN:  Your Honor, this wasn't knee jerk on my part.

THE COURT:  No, I'm not accusing you of that.

MR. BURSTEIN:  I have a real reason in this particular case.  It's because of the title of this statute, because it's a terrorism charge it sends up red flags at the BOP.  We know from other people with similar charges.

THE COURT:  How's that going to change?  There's nothing I can do that can change the title of the charge to which he's pled guilty.

MR. BURSTEIN:  It's a combination.  Your Honor, has it within the Court's power to take two points off, that two points would have a meaningful -- I can't guarantee it.

THE COURT:  You're talking about designation points now?

MR. BURSTEIN:  That's right.  And security risk points.

THE COURT:  Well, have you done that?  Have you tried to figure out where he is in category I, being out on bond

pending sentencing?

And they tell me, this argument's been made to me before that, well, it makes a difference whether somebody self-surrenders.  I called over.  I talked to Nelly Cline, I talked to the prison designator, they said absolutely not, it's not true.  I know you've quoted from a manual, but is it antiquated?  I mean have you checked?

MR. BURSTEIN:  No, Your Honor.  This is what I found online from the BOP.  Here's the --

THE COURT:  That it still matters.

MR. BURSTEIN:  Can I take a step back, Your Honor.

THE COURT:  Yeah.

MR. BURSTEIN:  Let's just say for argument's sake that we're right, that it does matter.  Here's somebody, he's been on bond since the moment he's been arrested, he's made every court appearance coming down from San Francisco.  Here's somebody who's in category I.  If there's a chance, even a substantial chance -- I will walk him to court tomorrow.  If doing that can get him into something that more accurately reflects where he is and not put him in some kind of terrorism, I'm asking the Court to make an exception one time.

THE COURT:  So tell me this, Mr. Burstein, do they have categories on the designation?  You say it's point driven like the guidelines, but do they have a category like zero to five points are in the lowest category?

MR. BURSTEIN:  I'm not that familiar with it.  I focused on this one issue.

THE COURT:  Well, that's what I want to know.  Because if it makes a difference then what you say makes sense, if it pushes him into another category or he's, you know, likely to go to some maximum prison instead of a camp or something like that, then as a practical matter I'd agree with you.

If it makes no difference in light of all of the other salient considerations, lack of record, the fact that he was out on bond, length of sentence, then I'm not inclined to do it.  There's a value to finality.  I mean people came, Ms. Graf came to see the sentence imposed today.  He's waiving appeal. There's no recourse after this.  It seems to me he should go in.

Now you're making a very modest request, one day.

MR. BURSTEIN:  One day, Your Honor.  I can guarantee it, can we please have one day?

THE COURT:  He's going to stay here.

MR. BURSTEIN:  He'll stay in San Diego.

THE COURT:  All right.  All right.  I'm reluctant to do it but.

MR. BURSTEIN:  Thank you, Your Honor.

THE COURT:  All right.  The Court adopts the guideline calculations set forth in the government's sentencing summary chart.  I've already expressed my view on the recommended

sentence.  I'm to keep the guidelines in mind, reevaluate under 3553, all of that is superfluous here because I exercised no discretion.  As I've said, this disposition was bought and paid for by the United States.  If people disagree with it, then they should talk to the U.S. Attorney about it, not me.  As I said, I'm handcuffed on this.

The Court finds that 24 months is the appropriate sentence here given the acceptance of the plea under 11(c)(1)(c).  I impose a 24-month sentence on Mr. Buddenberg.

The government's also recommending less than the full term of supervised release?

MR. PARMLEY:  Yes, Your Honor.

THE COURT:  Again, having accepted the plea, I'm stuck with that outcome as well.  The Court imposes the two years of supervised release.  The conditions are these, Mr. Buddenberg, you're to tell the probation officer about all automobiles you own or drive.  You're to submit to a search of your person, your property, your vehicle, your residence by the probation officer.

You're to complete a financial disclosure form that the probation officer will give you.  Notify the collections unit of the U.S. Attorneys office of any interest in property that you obtain directly or indirectly, including interest in a trust, partnership, real property, up until the time the restitution is paid.  The Court has not ordered a fine here.

Also you're to notify the U.S. Attorneys collections office before transferring any interest you may have in property directly or indirectly, including all the aforementioned types of property that I recited in the other condition.

I don't think there's a need on this checking account charges.  I'm not going to order that.  I don't think that's indicated here.  I do find condition seven, I've sustained the objection to that, I'm not going to have him monitored or subject to home detention.

Condition eight, I do -- I am going to impose at this time subject to modification within the next 10 days depending on the cost.  If it's a nominal cost, then the condition will apply, but he's not to use or possess devices that can accommodate data via modem or dedicated connection without prior approval of the Court or the probation officer.  And he's to consent to the installation of systems that'll enable the probation officer to monitor the computer use.

Part and parcel with that, I don't want you going to sites that advocate violence in connection with animal rights advocacy.  There's a difference.  There's a distinction.  So that's easy to keep in mind.  I don't want you going to sites where this activity that you engaged in was posted and championed.

MS. CHALMERS:  Your Honor, I'm sorry to interrupt, I did receive a response from our office.  The current vendor,

now know we're in the southern district and I saw --

THE COURT:  He's going to live in the northern district.

MS. CHALMERS:  In the southern district currently, $50 to install on a computer and $35 a month.

MR. BURSTEIN:  That's not nominal, Your Honor.

MS. CHALMERS:  Now, I have no idea what the other district charges or if they use a similar vendor.

THE COURT:  Yeah.

MR. BURSTEIN:  My guess is San Francisco is more expensive.

THE COURT:  It's 35 a month, I guess, that could otherwise go toward restitution.  So I'll sustain the objection to that, there won't be any monitoring.  I will impose a condition that he not post on sites that advocate violence, encouraging that type of activity.

The Court sets the restitution amount subject to the clarification that Mr. Parmley offered regarding naming an additional victim who was not named there in the amount of $398,272.  Mr. Buddenberg is to pay a hundred dollars a month once he's released from custody.  That amount should be reviewed depending on his income with an eye toward increasing it.  The government recommended -- excuse me, probation recommended 250 a month, there was an objection to that.

I think it's fair that he start off at a hundred a

month, but I want that closely monitored.  I want him to pay restitution.  The Court directs that the first amounts of restitution go to the Graf family, that it not be proportionate, that it go to them first.  Ms. Graf is the one who showed up here in court.  So as he pays restitution, it'll all go toward paying the $30,000 amount that's owed to the Graf family and then it can be pro rata distributed among the other victims that are listed in the chart on page 26.

And tell the probation officer again, Mr. Parmley, who's missing from that chart.

MR. PARMLEY:  Bonlander Farms.  It was earlier in the presentence report, it just got missed from the chart.

MS. CHALMERS:  For $141,600?

MR. PARMLEY:  For $141,600.

MS. CHALMERS:  Thank you, Your Honor.

THE COURT:  As I said, no fine is imposed.  A hundred dollar penalty assessment is imposed.  While the defendant is in custody, he's to make restitution payments starting at $25 a quarter.  He can work in prison industries doing that.

Mr. Buddenberg, I'm reluctant about this, but I'm going to allow you to self-surrender tomorrow at 9:00 in the morning.  So you're staying here in San Diego tonight?

THE DEFENDANT:  Yes.

MR. BURSTEIN:  Yes.

THE COURT:  Mr. Burstein says he'll walk you over.

He's to surrender to the marshals no later than 9:00 tomorrow morning.

MR. BURSTEIN:  9:00.  We'll be here, Your Honor.

THE COURT:  My understanding is given this disposition there's no right to appeal nor to collaterally attack the Court's judgment in the future, the conviction is final for all purposes?

MR. BURSTEIN:  That's correct, Your Honor.

MR. PARMLEY:  That is correct.

MR. BURSTEIN:  If the judgment could note the self-surrender date, that would be of great assistance.

THE COURT:  Gabby will make sure that that, he's to self surrender tomorrow.

MR. BURSTEIN:  Oh, and a recommendation for the western region, please, Your Honor.

THE COURT:  Recommend that also.

MR. BURSTEIN:  Thank you.

THE COURT:  All right.  Good luck, Ms. Graf.  Thank you for coming again.

MR. PARMLEY:  Thank you, Your Honor.

MR. BURSTEIN:  I've received the conditions, Your Honor.

   (The proceedings concluded at 10:41 a.m., May 2, 2016.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA R. OTT, Official Court Reporter, United States District Court, Southern District of California, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing is a true, complete and correct transcript of the stenographically reported proceedings had in connection with the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at San Diego, California, May 6, 2016.


_/s/ CYNTHIA R. OTT_
CYNTHIA R. OTT, RDR, CRR